# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588

WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

___

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

December 11, 2015

By ECF

The Honorable John Gleeson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

     Re: United States v. HSBC Bank USA, N.A. and HSBC Holdings plc
       Criminal Docket No. 12-763 (JG)

Dear Judge Gleeson:

    We represent HSBC Bank USA, N.A. and HSBC Holdings plc (together, "HSBC") and write in opposition to Hubert Dean Moore's application to unseal the Monitor's First Annual Follow-Up Report ("Monitor's Report" or "Report").  No other party has joined Mr. Moore's application, despite this Court's public invitation to do so.

    In their June 1, 2015 submissions, HSBC, the Government, the Monitor, and financial regulators in four different countries with oversight of HSBC's operations explained why maintaining the Monitor's Report under seal is critical both to the success of the monitorship and to avoiding the numerous negative consequences that would follow from the public unveiling of the Report.  (*See* Dkt. 35 and attachments; Dkt. 38.)  The parties stated that the public release of the Monitor's Report would undermine the very purpose of the monitorship by compromising the ability of the Monitor and the Government to assess HSBC's progress in improving its anti-money laundering and sanctions compliance program.  The parties noted that a number of regulatory authorities had expressly relied on assurances of confidentiality of the Monitor's work that were provided in advance of the Monitor's visits to HSBC's country operations.  The parties further explained that the public release of the Report would negatively affect the ability of HSBC's financial regulators to fully discharge their supervisory responsibilities over HSBC.  In addition, the Government and the Monitor cautioned that unsealing the Report would provide criminals seeking to engage in activities such as money laundering or terrorist financing a road map for exploiting current weaknesses in the anti-money laundering and sanctions compliance program at HSBC and potentially other financial institutions.  Finally, the parties noted that the ability of monitors and regulators of other

institutions to effectively perform their duties would suffer if reports such as this were to become public.

Mr. Moore has not identified a public interest in access to the Monitor's Report sufficient to outweigh those significant consequences. Nor is there one. Mr. Moore asserts that the Report somehow would support his complaint against HSBC Mortgage Services, Inc. before the Consumer Financial Protection Bureau ("CFPB"). Mr. Moore does not explain, however, why he believes that the Monitor's Report—which addresses HSBC's anti-money laundering and sanctions compliance program and not its mortgage servicing practices—contains information that would be useful in his complaint regarding his residential mortgage. In any event, Mr. Moore's personal interest in access is not the relevant inquiry under the applicable law. And even if it were, that interest would not outweigh the countervailing interests that the parties identified in support of maintaining the Report under seal.

**I.  Background**

   *A.  The submission of the Monitor's Report under seal*

On January 21, 2015, the Monitor issued the Report as required under the terms of the Deferred Prosecution Agreement ("DPA") between the Government and HSBC. In its quarterly report to this Court on April 1, 2015 (Dkt. 33), the Government summarized the Monitor's conclusions set forth in the Report and much of the factual support for those conclusions. On April 28, 2015, this Court ordered the Government to submit the Monitor's Report in its entirety for the Court's review.

On June 1, 2015, the Government filed the Monitor's Report together with an application to maintain the Report under seal. That application was joined by HSBC, the Monitor, and four of HSBC's financial regulators: (i) the Board of Governors of the Federal Reserve System; (ii) the U.K. Financial Conduct Authority; (iii) the Hong Kong Monetary Authority; and (iv) Bank Negara Malaysia. (*See* Dkt. 35 and attachments; Dkt. 38; collectively, the "June 1 submissions.") As explained by the Government and each of the supporting submissions, maintaining the Monitor's Report under seal is necessary to protect a number of law enforcement and privacy interests and to facilitate the continued effectiveness of the monitorship. No individual or entity opposed the filing of the Report under seal until five months later, when Mr. Moore submitted his letter.

   *B.  Mr. Moore's application*

On November 3, 2015, Mr. Moore submitted a letter to the Court requesting access to the Monitor's Report in connection with a complaint he filed with the CFPB. (Dkt. 42.) On November 6, 2015, the Court issued an order construing Mr. Moore's letter as a motion to unseal the Monitor's Report. The Court directed that any other application to unseal the Monitor's Report be filed on or before November 25, 2015. On November 30, 2015, Mr. Moore submitted supplemental support for his request. (Dkt. 43.) No other application to unseal has been filed.

Case 1:12-cr-00763-JG   Document 46   Filed 12/11/15   Page 3 of 8 PageID #: 1365

The Honorable John Gleeson                                                                                          -3-

Mr. Moore holds a residential mortgage that previously was both owned and serviced by HSBC Mortgage Services, Inc.[1] Mr. Moore's mortgage has been sold to a non-HSBC entity, and the mortgagee's interest transferred on December 7, 2015. HSBC Mortgage Services continues to service Mr. Moore's mortgage.

Mr. Moore's CFPB complaint concerns his attempts to obtain a modification to the terms of his mortgage. Mr. Moore has submitted several applications for loan modification. HSBC understands that the CFPB has accepted HSBC Mortgage Services' explanation for why Mr. Moore has not obtained a loan modification and thus considers Mr. Moore's complaint closed. (*See also* Dkt. 42 at 2 (referring to "CFPB's response that they had 'reached out' to HSBC and were satisfied with HSBC's answer").) Mr. Moore is not the subject of foreclosure proceedings at this time and has not been since 2009.

In his letters to this Court, Mr. Moore requests access to the Monitor's Report in order to provide "all of the relevant information" to the CFPB for purposes of evaluating his complaint. (Dkt. 42 at 2.) He contends that the Monitor's Report would "validate [his] claims that HSBC is in direct violation of multiple sections of" consent decrees (i) between HSBC North America Holdings and the Federal Reserve; and (ii) between HSBC Bank USA, N.A. and the Office of the Comptroller of the Currency. (*Id.* at 1; *see also* Dkt. 43 at 2-3.) Both consent decrees pertain to HSBC's residential mortgage servicing practices, including loss mitigation and foreclosure-related activities. Mr. Moore asserts that he believes the Monitor's Report will corroborate his view that HSBC has not fulfilled its obligations under those consent decrees. (Dkt. 43 at 3.) He does not explain the basis for his belief.

II. **Substantial Interests Support Maintaining the Monitor's Report Under Seal.**

As explained at length in the parties' June 1 submissions, maintaining the Monitor's Report under seal in its entirety is necessary to further vital interests in facilitating a successful monitorship in this and future cases and preventing misuse of the highly confidential information contained in the Report for unlawful purposes.

A. *Public disclosure of the Monitor's Report would jeopardize the monitorship.*

The scope of the monitorship includes HSBC's more than 60 global affiliates, which reside in countries that have varying bank-secrecy and data-privacy laws and regulatory requirements. As HSBC previously explained, providing the necessary level of access for the Monitor to conduct a comprehensive review of HSBC's anti-money laundering and sanctions controls has required HSBC to put in place a robust information-sharing framework, under which the Monitor is described as a service provider to the Bank. (Dkt. 38 at 3-4.) HSBC has had to reassure certain regulators that, consistent with the terms of the DPA, any confidential information provided to the

---

[1] HSBC Mortgage Services, Inc. is not a subsidiary of HSBC Bank USA, N.A., although it is an indirect subsidiary of HSBC Holdings plc.

Monitor would be adequately protected from disclosure to third parties. (Dkt. 35 at 8-9 (DOJ); Dkt. 35-1 ¶¶ 8-10 (Monitor); Dkt. 38 at 3-4 (HSBC).) In a number of cases, regulators have requested to speak with the Monitor himself about the work he intends to perform and—most relevant here—whether the information to which he seeks access will remain confidential.

The DPA explicitly provides that the Monitor's "reports and the contents thereof are intended to remain and shall remain non-public." (Dkt. 3-4 ¶ 9.) In reliance on that agreement, both HSBC and the Monitor have given their express assurances to HSBC's non-U.S. regulators that the Monitor's work will remain strictly confidential. The Monitor noted that in his many interactions with HSBC's various regulators around the world, "the presumption of confidentiality has been a critical component in obtaining foreign regulators' agreement to access confidential client information and to rely on it in preparing my reports." (Dkt. 35-1 ¶ 9.) The Monitor provides examples of interactions with regulators in which "my in-person assurance to those regulators that their countrymen's information would be reviewed in confidence—and the results shared only with the FCA, DOJ, and FRB—was crucial to being allowed to see unredacted client files." (*Id.*) HSBC's regulators have amplified the importance of confidentiality to the Monitor's continued access to non-U.S. materials. For example, Bank Negara Malaysia explained that it was "assured that the information obtained and findings made by the Independent Compliance Monitor would be treated with utmost confidentiality, consistent with the confidentiality provisions in our legislation, *i.e.* the Financial Services Act 2013, the Islamic Financial Services Act 2013, the Central Bank of Malaysia Act 2009 and the Anti-Money Laundering, Anti-Terrorism Financing and Proceeds of Unlawful Activities Act 2001." (Dkt. 35-5 ¶ 2.) All of the Monitor's work to date has proceeded under this assurance of confidentiality, and the Monitor is currently in the process of preparing his next annual report based on that same expectation.

To now publicly release the Monitor's Report would directly contravene those assurances. Such a result might cause those non-U.S. regulators to feel misled, or to conclude that they cannot rely upon assurances of confidentiality regarding the work of corporate compliance monitors appointed in connection with U.S. legal proceedings—either of which would have substantial negative ramifications for the success of this monitorship and future ones. Indeed, if the Report were to become public, certain regulators might decide to withdraw altogether their consent to the Monitor's site visits. Other regulators likely would feel compelled to significantly restrict the confidential information to which the Monitor is given access. The inability of the Monitor to access this information and provide his findings to the Government in a timely manner would compromise the efficacy of the monitorship.

Publicly releasing the Monitor's Report might also compromise the effectiveness of the Monitor's work itself. As explained in several of the June 1 submissions, open and candid cooperation on the part of HSBC employees is a critical component of the Monitor's investigative work and of HSBC's ability to improve its systems and controls. (Dkt. 35 at 9-10 (DOJ); Dkt 35-1 ¶ 11 (Monitor); Dkt. 35-3 ¶ 20(c) (FCA); Dkt. 35-4 at 2 (HKMA); Dkt. 38 at 4-5 (HSBC).) For example, the FCA cautioned that "the absence of confidentiality may affect the level of cooperation

currently offered by HSBC employees and [there is a risk] that they may be less willing to be open, honest and candid, which would also be detrimental to FCA's ability to adequately supervise the [HSBC] Group." (Dkt. 35-3 ¶ 20(c).) Lower-level employees may not be willing to be candid with the Monitor if they know they might be publicly associated with or identified by the information they provide, and senior employees may be less willing to assist in the process if they fear they will be publicly portrayed in an unfavorable light in a future report.

Filing a redacted version of the Report is not an adequate or practical means of satisfying these concerns. (Dkt. 35 at 12-13 (DOJ); Dkt. 35-1 ¶ 13 (Monitor); Dkt. 35-3 ¶ 24 (FCA); Dkt. 38 at 5 (HSBC).) Doing so would provide no assurance to regulators concerned about confidentiality—they would lack control over which parts of the Report would be redacted, and thus might still decide that restricting access altogether is the only sure way of protecting confidential information. Similarly, HSBC employees concerned about being publicly identified by or associated with the Report might choose to be less than fully candid rather than depend on a redaction process into which they will have no input. And even if all of the confidential information in the 1,000-page report theoretically *could* be redacted to satisfy all of these concerns, the resulting public version of the Report would be virtually unintelligible and more likely to mislead the public than to inform it. *See United States* v. *Amodeo*, 71 F.3d 1044, 1052 (2d Cir. 1995) (maintaining entire document under seal is appropriate when redacted version would be unintelligible and misleading); (Dkt. 35 at 12-13 (DOJ); Dkt. 35-1 ¶ 13 (Monitor); Dkt. 35-3 ¶ 24 (FCA).)

In short, HSBC is fully committed to facilitating a successful monitorship, but that goal cannot be achieved if the threat of public disclosure of the Monitor's work product looms over the entire process.

   B. *Public disclosure of the Monitor's Report could facilitate unlawful financial activity.*

The Monitor's Report contains detailed descriptions of HSBC's systems and processes designed to detect and prevent money laundering, terrorist financing, and other financial crimes. Among other things, the Report identifies vulnerabilities, gaps, and areas requiring immediate remediation. As the Government and the Monitor explained in their June 1 submissions, if the Monitor's Report were to be made public, individuals and entities seeking to exploit those or similar weaknesses at HSBC—or potentially at other financial institutions—would have a detailed roadmap for doing so. (Dkt. 35 at 11 (DOJ); Dkt. 35-1 ¶ 12 (Monitor).) HSBC's financial regulators expressed similar concerns. The FCA, for example, cautioned that "publishing this information may enable money launderers and those attempting to evade sanctions controls to target and further exploit HSBC in order to facilitate increased levels of illegal activity." (Dkt. 35-3 ¶¶ 21-23; *see also* Dkt. 35-2 at 3 (FRB); Dkt. 35-4 at 2 (HKMA); Dkt. 38 at 5 (HSBC).) Indeed, even publicizing details about the controls that the Monitor deemed to be satisfactory could provide valuable information to those seeking to avoid detection of unlawful activity. Where public disclosure would aid criminals in circumventing the

very controls that the monitorship is intended to improve, maintaining the Report under seal serves a compelling interest.

### III. Mr. Moore's Letters Provide No Basis to Unseal the Monitor's Report in View of the Vital Interests in Keeping It Confidential.

Mr. Moore argues that he should be provided access to the Monitor's Report because he believes it will support his CFPB complaint that HSBC has improperly denied him a loan modification. But even if the Report were relevant to Mr. Moore's complaint—which it is not—Mr. Moore's individual need for access is not the relevant inquiry in determining whether to unseal the Report. The question is whether the document should be disclosed to the *general public*. Both the common law and First Amendment rights of access are intended to safeguard the "*public* perception of the judiciary's legitimacy and independence," *United States* v. *Aref*, 533 F.3d 72, 83 (2d Cir. 2008) (emphasis added), not any individual's private interest in making use of the document. Accordingly, if the common law or First Amendment right of access does not require the disclosure of a document to the general public, then the requesting individual's motive for seeking access to the document is irrelevant. *See, e.g.*, *Amodeo*, 71 F.3d at 1050 ("[T]he presumption of access is based on the need for the public monitoring of federal courts . . . [and] we believe motive generally to be irrelevant to defining the weight accorded to the presumption of access."); *United States* v. *Belfort*, 2014 WL 2612508, at *4 (E.D.N.Y. June 11, 2014) (assuming that an individual's request for access was "made in good faith and for a proper purpose" but nonetheless denying access due to the "potential harm that could come from releasing the document *to the public*") (emphasis added). This Court invited other members of the public to join in Mr. Moore's application to unseal the Monitor's Report. No party has done so. Mr. Moore's individual reasons for seeking the release of the Report are insufficient, on their own, to warrant public disclosure.

In any event, Mr. Moore has not demonstrated any likelihood that the Report would be relevant to his CFPB complaint. Mr. Moore's complaint stems from his inability to obtain a modification of his mortgage, and as such, he references unrelated consent decrees relating to HSBC's residential mortgage servicing business. But the Monitor's Report does not arise out of those consent decrees or any other consent decree related to mortgage servicing; it was produced in connection with the monitorship pursuant to the DPA. Mr. Moore has failed to explain how the Monitor's Report, intended to address the status of HSBC's anti-money laundering and sanctions compliance program, would also contain information about HSBC's residential mortgage servicing business that would be relevant to Mr. Moore's CFPB complaint.

Mr. Moore also notes that a news article published in July 2015 states that a reporter had access to the Monitor's Report. (Dkt. 42 at 1); *see* Greg Farrell, "Sealed HSBC Report Shows U.S. Managers Battling Cleanup Squad," *Bloomberg Business*, July 7, 2015. Even if it were relevant to the sealing question, the *Bloomberg* article would not justify unsealing the Report in its entirety. The article discussed only certain, limited findings of the 1,000-page Report; specifically, the actions of certain U.S. HSBC personnel. By contrast, the Monitor's Report discusses a great many other aspects of his

findings regarding HSBC affiliates across the globe. *See In re Application of the U.S. for an Order Pursuant to 18 U.S.C. § 2703(d)*, 830 F. Supp. 2d 114, 151 (E.D. Va. 2011) (noting the "significant difference between revealing the existence of an investigation, and exposing critical aspects of its nature and scope," and rejecting the argument that press coverage of investigative documents means that they should be unsealed).

HSBC was dismayed at the prospect that confidential information from the Monitor's Report had been published in a news article. From the beginning, HSBC has implemented strict controls over access to, and dissemination of, the Monitor's Report and related material, and it immediately launched an internal review to determine whether any of its personnel had disclosed any confidential information from the Report that could have been a source of the *Bloomberg* article. HSBC has found no evidence that the reporter obtained the Monitor's Report from HSBC (or, for that matter, that the reporter actually reviewed the Report). Even so, HSBC has continued to take steps to ensure that appropriate controls are in place at the Bank to protect the confidentiality of the Monitor's reports.

The publication of the information in the *Bloomberg* article jeopardized the integrity of the monitorship. It would be inequitable and create perverse incentives to use the fact that members of the press purportedly gained unauthorized access to portions of the Report, notwithstanding the parties' intent that it remain confidential, as a reason to publicly expose the highly confidential contents of the entire Report. *See id.* (acknowledging the "perverse incentives" that would be created if "a party could leak a controversial sealed document to the press, then point to the ensuing publicity as evidence that further sealing is unnecessary"). The Court should not use a potential unauthorized disclosure of a confidential document as a basis to further expose that document to the general public.

## IV.   Conclusion

HSBC is committed to improving, on a global basis, its internal controls designed to detect and prevent money laundering, terrorist financing, and other criminal activities. The monitorship is an important part of that effort. As a result, HSBC has gone to great lengths to facilitate the Monitor's access to HSBC's confidential information across its global affiliates. Making the Monitor's Report publicly available would risk slowing, and even undoing, the very improvements that HSBC is working to implement.

The Honorable John Gleeson -8-

Mr. Moore has identified no public interest in access sufficient to outweigh those significant consequences, and there is none. In light of these concerns and those discussed at length in the June 1 submissions, HSBC respectfully requests that the Court maintain the Monitor's Report under seal in its entirety.

          Sincerely,

          /s/

Samuel W. Seymour
Alexander J. Willscher
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Tel.: (212) 558-4000
Fax: (212) 558-3588

*Counsel for HSBC*

cc: All Counsel of Record (via ECF)