The Honorable Ann Donnelly

Hubert Dean Moore, Jr.

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ APR 1 0 2016 ★

BROOKLYN OFFICE

618 Meadow Drive
West Chester,
Pennsylvania
19380
USA

April 4 2017

The Honorable Judge Ann Donnelly
United States District Court
Eastern District of New York,
225 Cadman Plaza East
Brooklyn, NY 11201

<u>**Re: United States v. HSBC Bank USA, N.A. and HSBC Holdings plc Criminal Docket No. 12-763**</u>
<u>**(JG)**</u>

Dear Judge Donnelly,

As a matter of great urgency the following needs to be brought to the attention of both yourself and the Court; as a very serious situation concerning the behavior of the following named parties exists:

1) HSBC USA N.A. and their Legal Department and Officers.

1 a) HSBC Holdings plc,

1 b) Mr Douglas Jardine Flint Chairman, HSBC Holdings plc,

1 c) Mr Stuart Gulliver CEO of HSBC Holdings plc.

1 d) Mr Stuart Levey Chief Legal Officer of HSBC Holdings plc and their Legal Department and Officers.

1 e). The Board of Directors of HSBC Holdings plc,

1 f) HSBC Mortgage Services and their Legal Department and Officers.

2) Sullivan and Cromwell LLP.

2 a) Mr Joseph. Shenker and Sullivan and Cromwell LLP.

2 b) Samuel Seymore and Alexander Willshire, employees of Sullivan and Cromwell LLP.

3) LSF 9 Master Participating Trust C/O Caliber Home Loans, INC and their Legal Department and Officers.

4) That the named parties above did with intent did knowingly and willingly engage in such practices to deliberately interfere with the case referenced before The Honorable Judge John Gleeson, in United States District Court Eastern District of New York (documented evidence is accompanied with this letter).

The Honorable Ann Donnelly

5) The named parties, Samuel Seymore and Alexander Willshire employees of Sullivan and Cromwell LLP, Sullivan and Cromwell LLP, HSBC USA N.A. and their Legal Department and Officers and HSBC Holdings plc, the Chairman Mr. Douglas Jardine Flint and their Legal Department and Officers, HSBC Mortgage Services and their Legal Department and Officers and LSF 9 Master Participating Trust C/O Caliber Home Loans, INC and their Legal Department and Officers did with intent did knowingly and willingly colluded together in the case reference number Criminal Docket No. 12-763 (JG) to deceive the Court.

6) I will now draw the Court's attention to the following dates, from the filing of my case on 5 November 2015, 12 November 2015, 23 of November 2015, 08 of December 2015, 11 December 2015, December 16, 2015, 23 December 2015 and 7 April 2016.

The dates listed will show categorically the importance of the timeframe that the named parties engaged in their practices to knowingly and willingly in their attempt to deceive the Court and to discredit my standing as a customer of HSBC Mortgage Services.

6 a) LSF5 Accredited Mergers Co., Inc., filing with the Securities and Exchange Commission (SEC) dated June 19, 2007

**HSBC Mortgage Services**

1) HSBC Mortgage Services did with intent knowingly and willingly force payment of my school taxes 23 of November 2015, in the sum of $ 3,965.69, which they have no legal right to do. As I did not have an Escrow Account, HSBC Mortgage Services needed my written authorization to pay said taxes.

2 a) I have included as evidence a letter from West Chester Area School District dated 27 January 2017 stating that my taxes would become delinquent on 1 January 2016, but as of the date of payment my taxes were not delinquent.
To please the Court, we will enter into court the document and ask for it to be listed as exhibit 1.

2 b) I have included as evidence a receipt from Berkheimer (Tax administrator) West Chester

To please the Court, we will enter into court the document and ask for it to be listed as exhibit 1 a.
West Chester Area School District dated November 23, 2015 check number 31721930 payment of $ 3,965.69.

The named parties above did with intent did knowingly and willingly colluded together or in unison of two or more of the named parties in the case reference Criminal Docket No. 12-763 (JG) in an attempt to deceive the Court of my standing and right concerning my case file with the court.

3). At no time since 23 of November 2015 to the date of this letter, has HSBC Mortgage Services provided me with any documentation or information that they had paid said taxes.

4). HSBC Mortgage Services was unable to sell my mortgage, because I had until the December 31, 2015 to pay my taxes and therefore by paying the said taxes, this was to allow HSBC Mortgage Services to sell my mortgage to LSF9 Master Participating Trust C/O Caliber Home Loans, Inc., on 8 December 2015.

5). HSBC Mortgage Services have deliberately with intent ignore their legal and contractual obligations concerning my mortgage, as they had a duty to inform us of any changes.

6) HSBC Mortgage Services never informed me that they forced payment of my taxes on November 23, 2015, nor did they seek reimbursement of said payment or provide me with any documentation concerning the payment of said taxes.

The Honorable Ann Donnelly

This denied me the right to challenge Samuel Seymore and Alexander Willshire, employees of Sullivan and Cromwell LLP, on the documentation they filed with the court on behalf of their clients HSBC USA N.A. and HSBC Holdings plc on December 11, 2015.

6 a) HSBC Mortgage Services did add payment of said taxes in the invoice presented to LSF9 Master Participating Trust C/O Caliber Home Loans, Inc.,

7). Under the documentation supplied by LSF9 Master Participating Trust C/O Caliber Home Loans, Inc, the said taxes paid by HSBC Mortgage Services are listed under miscellaneous by HSBC Mortgage Services.
To please the Court, we will enter into court the document and ask for it to be listed as exhibit 2.

**Timeframe**:

8). The importance of the timeframe:  HSBC Mortgage Services illegally paid the taxes to West Chester Area School District on November 23, 2015. This enabled HSBC Mortgage Services to sell my mortgage within 14 days to LSF9 Master Participating Trust C/O Caliber Home Loans, Inc., on December 8, 2015.

This enabled Samuel Seymore and Alexander Willshire, employees of Sullivan and Cromwell LLP, to file their documentation with the Court on behalf of their clients HSBC USA N.A. and HSBC Holdings plc on December 11, 2015. This was done within 72 hours of the sale of my mortgage by HSBC Mortgage Services to LSF9 Master Participating Trust C/O Caliber Home Loans, Inc., on December 8, 2015 and the filing on December 11, 2015 was the last day Samuel Seymore and Alexander Wiltshire employees of Sullivan and Cromwell LLP could file the documentation with the Court.

9) ) HSBC Mortgage Services has failed to register the sale of my property to LSF9 Master Participating Trust C/O Caliber Home Loans, Inc., either at County level or State level, as per the requirements of Chester County and the Commonwealth of Pennsylvania.

10). We refer the court to the letter dated November 12, 2015 from LSF9 Master Participating Trust, titled: NOTICE OF SALE OF OWNERSHIP OF YOUR MORTGAGE LOAN. In their letter LSF9 Master Participating Trust states: Date Ownership Transferred to Us November 2, 2015.

To please the Court, we will enter the document and ask for it to be listed as exhibit 3.

11). We refer the Court to case reference number Civil Action NO. 2016-11197-RC in Commonwealth of Pennsylvania, this will show the close relationship between HSBC Mortgage Services and LSF9 Master Participating Trust C/O Caliber Home Loans, Inc. More importantly it will show that both entities will engage in such practices with blatant disregard to the Law.

**Samuel Seymore and Alexander Willshire employees of Sullivan and Cromwell LLP and Sullivan and Cromwell LLP**

1). We draw the Court's attention to the documentation that Samuel Seymore and Alexander Willshire, employees of Sullivan and Cromwell LLP, on behalf of their clients HSBC USA N.A. and HSBC Holdings plc did file with the court, the case reference Criminal Docket No. 12-763 (JG)  before The Honorable Judge John Gleeson, in United States District Court Eastern District of New York on 11 December 2015.

2). The said documentation filed by Samuel Seymore and Alexander Willshire on behalf of their clients  before The Honorable Judge John Gleeson, in United States District Court Eastern District of New York on 11 December 2015 .

We refer the court to page 3 paragraph 1 sentence 3, where Samuel Seymore and Alexander Willshire   have stated to the court: " HSBC Mortgage Services continues to service Mr. Moore's mortgage".

The Honorable Ann Donnelly

Exhibit 7. Caliber Home Loans letter to the Pennsylvania Banking and Securities Commission dated November 7, 2016,

Respectfully submitted,


Hubert Dean Moore, Jr



WEST
CHESTER
AREA
SCHOOL
DISTRICT

$\mathcal{E}x$ - 1

829 Paoli Pike ● West Chester, Pennsylvania 19380 ● (484) 266-1034 ● FAX (484) 266-1178
● e-mail: mburgoyne@wcasd.net

January 26, 2017

Mr. Hubert Dean Moore, Jr
618 Meadow Drive
West Chester, PA 19380

Re:   Parcel #53-04N-0002.0000 – 618 Meadow Drive
      2015 School Real Estate Tax

Dear Mr. Moore,

West Chester Area School District issues tax bills on July 1st each year. A 2% discount is
offered on taxes paid between July 1 and August 31. A 10% penalty is charged on taxes
paid after October 31. The district accepts payment through December 31st. After December
31 all unpaid taxes are returned to the county tax claim office. We do not consider unpaid
taxes to be delinquent until January 1 of the following year. The 2015 school tax would be
considered to be delinquent on January 1, 2016 if it had not been paid by December 31,
2015.

Sincerely,

Mary Burgoyne
Tax Records

*Inspiring students to achieve their personal best*

2015-2016 DUPLICATE NOTICE          WEST CHESTER AREA SCHOOL DISTRICT

**berkheimer**
tax administrator

PO BOX 25144
LEHIGH VALLEY, PA 18002-5144

BILL NUMBER: 05852
MAILING DATE: 07/01/15
MAP NO: 53-04N-0002.0000
**LOCAL OFFICE LOCATION**
Payments accepted at any
Fulton Bank, PA 00000
TELEPHONE: 610-599-3143

0070010736100004965193

FLETCHER-MOORE ANN MARIE
ACCOUNT: 000530-0004140
MOORE HUBERT DEAN JR
618 MEADOW DR
WEST CHESTER, PA 19380

**OFFICE HOURS**
Regular Fulton Bank Hours

| ASSESSMENT | BASE ASSESSMENT | LESS EXCLUSION | NET BASE ASSESSMENT | TAX LIABILITY | BASE AMOUNT | LESS EXCLUSION | NET BASE AMOUNT |
|---|---|---|---|---|---|---|---|
| HOMESTEAD | 190,830.00 | 6,685.00 | 184,145.00 | HOMESTEAD | 3,736.05 | 130.88 | 3,605.17 |
| FARMSTEAD | 0.00 | 0.00 | 0.00 | FARMSTEAD | 0.00 | 0.00 | 0.00 |
| TOTAL | 190,830.00 | | 184,145.00 | TOTAL | 3,736.05 | | 3,605.17* |

| TYPE OF TAXES | BILL RATE | BASIS | 2.00% DISCOUNT UNTIL 08/31/15 | AT BASE UNTIL 10/31/15 | 10.00% PENALTY AFTER 10/31/15 |
|---|---|---|---|---|---|
| SCHOOL REAL ESTATE | 19.5779 ML | 184,145.00 | 3,533.07 | 3,605.17 | 3,965.69 |

CHECK # 31721930
POSTED ON 11/23/15

**PAID**
**berkheimer**
tax administrator

| DESCRIPTION | TOTAL TAX | | 3,533.07 | 3,605.17 | 3,965.69 |
|---|---|---|---|---|---|

SWS MEADOW DR
LOT 14 & DWG

UNPAID TAXES SENT TO LIEN ON: 01/01/16

WEST CHESTER AREA SCHOOL DISTRICT
Chester County, PA     ORIGINAL ASSESSMENT: 190,830
INELIGIBLE ASSESSMENT: 0

**GENERAL INFORMATION:**
- If you are requesting a return receipt, enclose a Self-Addressed Stamped envelope.
- There will be a $20.00 fee for returned checks.  Make checks payable to WEST CHESTER ASD. NO CASH PAYMENTS ACCEPTED. Date of postmark determines acceptance of payment.
- PAYMENTS MAY BE MADE AT ANY BRANCH OF FULTON BANK. BRING ORIGINAL BILL TO THE BANK.
- If taxes are paid by Mortgage Company, please forward this bill to them.
- Taxes are due and payable and payment is requested from the above named.
- PLEASE NOTE:  If remitting payment after December 1, checks will not be accepted.  Payment after December 1 must be in the form of a cashier's check or money order.
- All property taxes unpaid as of December 31 will be returned to the tax claim bureau of the county in which the property is located.  Please Note:  All Berkheimer offices are closed for the Holidays from December 24 thru January 1, therefore full and complete payment must be postmarked by December 31.
- NOTICE OF PROPERTY TAX RELIEF:  This tax bill may include a tax reduction for your homestead and/or farmstead property.  If you are eligible for homestead and/or farmstead, you have received tax relief through a homestead and/or farmstead exclusion which has been provided under the Pennsylvania Taxpayer Relief Act, a law passed by the Pennsylvania General Assembly designed to reduce your property taxes.
- This is an estimation of your after tax exclusion.  Due to rounding or if there is an ineligible assessment shown above, there may be a difference between this amount and the actual amount due found on the stub below.
- >>>>>> YOU MAY PAY ON LINE AT WWW.HAB-INC.COM BY CREDIT CARD, CHECKING OR SAVINGS ACCOUNT or by contacting our office at the number listed above. (a third party fee will apply)<<<<<<

Keep top portion for your records
Detach and return bottom portion with your payment

2015-2016 NOTICE                                    DUPLICATE
WEST CHESTER AREA SCHOOL DISTRICT
Chester County, PA

FLETCHER-MOORE ANN MARIE
ACCOUNT: 000530-0004140
MOORE HUBERT DEAN JR
618 MEADOW DR
WEST CHESTER, PA 19380

ACCOUNT NO:        000530-0004140
BILL NUMBER:       05852
MAP NO:            53-04N-0002.0000
TOTAL ASSESSMENT:  184,145

**SEE NEXT PAGE FOR INSTALLMENTS**

Check to reflect your enclosed payment:

| DISCOUNT | | |
|---|---|---|
| Until 08/31/15 | 3,533.07 | [ ] |
| BASE AMT | | |
| Until 10/31/15 | 3,605.17 | [ ] |
| PENALTY | | |
| After 10/31/15 | 3,965.69 | [ ] |

Remit To:

**WEST CHESTER AREA SD**
**PO BOX 4787**
**LANCASTER, PA 17604**

DO NOT WRITE BELOW THIS LINE



900800530000414005852201500000035330700000360517b

*Ex 2*



February 11, 2016

Hubert & Ann Marie Moore
618 Meadow Drive
West Chester, PA 19380

Sent Via USPS: 70142120000431709953

Re:     Loan Number:        9804489954

Dear Mr. and Mrs. Moore:

Caliber Home Loans, Inc., hereafter known as Caliber, servicer of the above-referenced loan, provides this response to your letter received by Caliber on January 12, 2016, wherein you requested validation of the debt and dispute debt owed. You additionally request the amount Caliber paid for your loan. You also stated you have not received a payment book or any other information about loan regarding the terms, interest rate, etc. You further stated your loan was being reviewed for a modification prior to the transfer to Caliber and you request an update on the status.

## Loan Information

- March 27, 2006: The loan originated with a principal balance of $490,000.00 with Accredited Home Lenders, Inc.
- The previous servicer of the loan was HSBC Mortgage Services, Inc.
- Caliber began servicing the loan on December 8, 2015.
- The loan is due for the August 1, 2015 and subsequent payments.
- The last payment was received on September 29, 2015.

## Requested Clarification

On December 21, 2015 a validation of debt letter was mailed to you advising of the current principal balance, interest, fees, and total debt.  At the time the loan was transferred to Caliber your principal balance was $451,180.58.  Since the loan was transferred we have not received any payment.  As of the date of this current letter, your principal balance remains $451,180.58. Please note this is not the payoff amount.

The interest rate of 6.99000%, on your loan calculates in arrears from the last payment date to but not including the payment date of the payment being made. Therefore, the interest amount of $14,860.42 was calculated from the date of your last payment to December 21, 2015; the date on the debt validation letter. This interest amount is what was due on the loan as of the date of the letter not how much interest you have paid to the loan thus far. We apologize for any confusion this may have caused.



Hubert & Ann Marie Moore
2/11/16
Page 2

Caliber has reviewed your loan and determined your loan currently has $32,625.72 in extension interest and $4,233.08 in uncollected fees/costs that remain due. A breakdown of those fees is listed below.

| Fee Description | Fee Assessed Date | Fee Amount Assessed | Fee Remaining Balance |
|---|---|---|---|
| Lender Paid Taxes | 11/30/2015 | $4,233.08 | $4,233.08 |

It is important to note, when Caliber began servicing your loan on June 1, 2015 these fees were transferred to Caliber from HSBC as outstanding fees owed. *Per your executed mortgage these fees are valid and will remain on the account until they are paid in full.* However, Caliber does not require these fees to be paid all at once.

**Loan Purchase**

It is unclear as to how your request for the amount Caliber purchased your loan for relates to a purported error on your loan as such the information will not be provided and is without merit.

**Monthly Billing Statements**

Our records indicate a Chapter 7 Bankruptcy was filed on the loan on March 20, 2008 and discharged on March 23, 2009 which would prevent the billing statements from being mailed. Please note in order to satisfy certain Federal or State obligations statements are not able to be generated while a loan is actively listed in a bankruptcy filing. Additionally, a signed written request to reactivate the billing statements has not been received.

Furthermore, please keep in mind that although you are not personally liable under the terms of the loan, due to the discharge through bankruptcy, the owner of the loan still has a lien against the property, which it may enforce under applicable law.

**Assistance**

Caliber has reviewed the modification efforts that have occurred on your loan. As of the date of this letter, Caliber has not received a loan modification request. If you are experiencing a financial hardship we have mailed you a loan modification package under separate cover. Please review and if interested you may return the completed form along with the required documentation for review. You can return this information via fax to 405-608-2011, email at calibermods@caliberhomeloans.com, via upload by accessing your loan on our website at www.caliberhomeloans.com, or mail to the following address:

RETURN SERVICE ONLY
Please do not send mail to this address
P.O. Box 619063
Dallas, TX 75261-9063

*er
Hom Loans , Inc   Ex 3*

November 12, 2015

*1 800 401 6587*

0-759-67142-0016647-004-1-000-000-000-000
HUBERT DEAN MOORE
ANN MARIE FLETCHER-MOORE
618 MEADOW DR
WEST CHESTER PA  19380-6235

*Purchase*

# NOTICE OF SALE OF OWNERSHIP OF MORTGAGE LOAN

The purpose of this letter is to inform you that your mortgage loan (described below) has been sold to LSF9 Master Participation Trust (hereinafter "Us," "We," "Our," or "Lender"). By law we are required to inform you that your loan has been sold to Us.

**LOAN INFORMATION**
Date of Loan: March 27, 2006
Account Number: 9804489954
Original Amount of Loan: $490,000.00
Date Ownership Transferred to Us:   November 02, 2015
Address of Mortgaged Property: 618 MEADOW DRIVE, WEST CHESTER PA '19380

**OUR INFORMATION (OWNER ONLY, _NOT YOUR SERVICER_)**
Name: LSF9 Master Participation Trust
Mailing Address (not for payments): c/o Caliber Home Loans, Inc., 13801 Wireless Way, Oklahoma City, OK  73134
Telephone Number (Toll free):  1-888-248-5075

**NOTE:  We are not the Servicer of your loan.**

The Servicer of your loan, _identified below_, is authorized to act and receive notices on our behalf, answer any questions about your loan, and collect your mortgage payments.  **Should you have any questions regarding your loan, please contact the Servicer using the contact information below.**  The Servicer will respond to inquiries and requests regarding your loan.

**Please continue to send your mortgage payments as directed by the Servicer, and NOT to Us.  Payments sent to Us instead of the Servicer may result in late charges on your loan and your mortgage loan becoming past due.  If you send your mortgage payments to Us rather than the Servicer, neither We nor the Servicer will be responsible for late charges or other consequences.  If the servicing of your mortgage loan is transferred, you will receive a separate notice as required by applicable law.**

**SERVICER INFORMATION**
Name:  HSBC MORTGAGE SERVICES INC
Mailing Address: P.O. Box 1231, Brandon, FL 33509
Telephone Number (Toll free): 800-333-7023

The transfer of the lien associated with your loan is currently recorded, or in the future may be recorded, in the public records of the local County Recorder's office for the county where your property is located. If checked ☒, ownership of your loan may also be recorded on the registry of the Mortgage Electronic Registrations System at 1818 Library Street, Suite 300, Reston, VA 20190.

**Partial Payments**

    If you make a monthly payment that is less than the full amount due that is called a Partial Payment. As your new Lender,

A)    We may accept Partial Payments and require the Servicer to apply them to your loan.

B)    We may require the Servicer to hold Partial Payments in a separate account until you pay the rest of the payment, and then apply the full payment to your loan.

If your loan is sold, the new Owner or Lender may have a different partial payment policy.

Thank you for your attention to this matter.

LSF9 Master Participation Trust



# CALIBER
## HOME LOANS

P.O. Box 24610
Oklahoma City, OK 73124-0610



**NOTICE OF SERVICING TRANSFER**

The servicing of your mortgage loan has been transferred, effective December 08, 2015. This means that after this date, a new servicer is now responsible for collecting your mortgage loan payments from you. Nothing else about your mortgage loan has changed as a result of the transfer.

HSBC MORTGAGE SERVICES INC was collecting your payments prior to December 08, 2015. HSBC MORTGAGE SERVICES INC, will stop accepting payments received from you after December 07, 2015.

Your new servicer, Caliber Home Loans, Inc., will collect your payments going forward. Caliber Home Loans, Inc. started accepting payments received from you on December 08, 2015.

**Send all payments due on or after December 08, 2015 to Caliber Home Loans, Inc., at this address: P.O. Box 650856 Dallas, TX 75265-0856.**

If you have any questions for either your prior servicer, HSBC MORTGAGE SERVICES INC or your new servicer, Caliber Home Loans, about your mortgage loan or this transfer, please contact them using the information below:

Prior Servicer:

HSBC MORTGAGE SERVICES INC
Customer Service
800-333-7023
P.O. BOX 1231
BRANDON, FL 33509

New Servicer:

Caliber Home Loans
1-800-401-6587
P.O. Box 24610
Oklahoma City, OK 73124

Important note about insurance: If you have mortgage life or disability insurance or any other type of optional insurance, premiums will not be transferred to Caliber Home Loans, Inc. and will be discontinued. Please contact the provider of the optional insurance or other membership product(s) directly regarding your continuation privileges, if applicable.

Under Federal law, during the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your prior servicer on or before its due date may not be treated by the new servicer as late, and a late fee may not be imposed on you.

Caliber Home Loans, Inc.                                        12/16/15

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*Ex 4*

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

December 11, 2015

By ECF

The Honorable John Gleeson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

      Re:    United States v. HSBC Bank USA, N.A. and HSBC Holdings plc
                Criminal Docket No. 12-763 (JG)

Dear Judge Gleeson:

        We represent HSBC Bank USA, N.A. and HSBC Holdings plc (together, "HSBC") and write in opposition to Hubert Dean Moore's application to unseal the Monitor's First Annual Follow-Up Report ("Monitor's Report" or "Report"). No other party has joined Mr. Moore's application, despite this Court's public invitation to do so.

        In their June 1, 2015 submissions, HSBC, the Government, the Monitor, and financial regulators in four different countries with oversight of HSBC's operations explained why maintaining the Monitor's Report under seal is critical both to the success of the monitorship and to avoiding the numerous negative consequences that would follow from the public unveiling of the Report. (*See* Dkt. 35 and attachments; Dkt. 38.) The parties stated that the public release of the Monitor's Report would undermine the very purpose of the monitorship by compromising the ability of the Monitor and the Government to assess HSBC's progress in improving its anti-money laundering and sanctions compliance program. The parties noted that a number of regulatory authorities had expressly relied on assurances of confidentiality of the Monitor's work that were provided in advance of the Monitor's visits to HSBC's country operations. The parties further explained that the public release of the Report would negatively affect the ability of HSBC's financial regulators to fully discharge their supervisory responsibilities over HSBC. In addition, the Government and the Monitor cautioned that unsealing the Report would provide criminals seeking to engage in activities such as money laundering or terrorist financing a road map for exploiting current weaknesses in the anti-money laundering and sanctions compliance program at HSBC and potentially other financial institutions. Finally, the parties noted that the ability of monitors and regulators of other

Case 1:12-cr-00763-AMD   Document 86   Filed 04/10/17   Page 12 of 25 PageID #: 3821
Case 1:12-cr-00763-JG   Document 46   Filed 12/11/15   Page 2 of 8 PageID #: 1364

The Honorable John Gleeson                                                    -2-

institutions to effectively perform their duties would suffer if reports such as this were to become public.

Mr. Moore has not identified a public interest in access to the Monitor's Report sufficient to outweigh those significant consequences. Nor is there one. Mr. Moore asserts that the Report somehow would support his complaint against HSBC Mortgage Services, Inc. before the Consumer Financial Protection Bureau ("CFPB"). Mr. Moore does not explain, however, why he believes that the Monitor's Report—which addresses HSBC's anti-money laundering and sanctions compliance program and not its mortgage servicing practices—contains information that would be useful in his complaint regarding his residential mortgage. In any event, Mr. Moore's personal interest in access is not the relevant inquiry under the applicable law. And even if it were, that interest would not outweigh the countervailing interests that the parties identified in support of maintaining the Report under seal.

## I.   Background

### A.   *The submission of the Monitor's Report under seal*

On January 21, 2015, the Monitor issued the Report as required under the terms of the Deferred Prosecution Agreement ("DPA") between the Government and HSBC. In its quarterly report to this Court on April 1, 2015 (Dkt. 33), the Government summarized the Monitor's conclusions set forth in the Report and much of the factual support for those conclusions. On April 28, 2015, this Court ordered the Government to submit the Monitor's Report in its entirety for the Court's review.

On June 1, 2015, the Government filed the Monitor's Report together with an application to maintain the Report under seal. That application was joined by HSBC, the Monitor, and four of HSBC's financial regulators: (i) the Board of Governors of the Federal Reserve System; (ii) the U.K. Financial Conduct Authority; (iii) the Hong Kong Monetary Authority; and (iv) Bank Negara Malaysia. (*See* Dkt. 35 and attachments; Dkt. 38; collectively, the "June 1 submissions.") As explained by the Government and each of the supporting submissions, maintaining the Monitor's Report under seal is necessary to protect a number of law enforcement and privacy interests and to facilitate the continued effectiveness of the monitorship. No individual or entity opposed the filing of the Report under seal until five months later, when Mr. Moore submitted his letter.

### B.   *Mr. Moore's application*

On November 3, 2015, Mr. Moore submitted a letter to the Court requesting access to the Monitor's Report in connection with a complaint he filed with the CFPB. (Dkt. 42.) On November 6, 2015, the Court issued an order construing Mr. Moore's letter as a motion to unseal the Monitor's Report. The Court directed that any other application to unseal the Monitor's Report be filed on or before November 25, 2015. On November 30, 2015, Mr. Moore submitted supplemental support for his request. (Dkt. 43.) No other application to unseal has been filed.

Case 1:12-cr-00763-AMD   Document 86   Filed 04/10/17   Page 13 of 25 PageID #: 3822
Case 1:12-cr-00763-JG   Document 46   Filed 12/11/15   Page 3 of 8 PageID #: 1365

The Honorable John Gleeson                                                        -3-

Mr. Moore holds a residential mortgage that previously was both owned and serviced by HSBC Mortgage Services, Inc.[1]  Mr. Moore's mortgage has been sold to a non-HSBC entity, and the mortgagee's interest transferred on December 7, 2015. HSBC Mortgage Services continues to service Mr. Moore's mortgage.

Mr. Moore's CFPB complaint concerns his attempts to obtain a modification to the terms of his mortgage. Mr. Moore has submitted several applications for loan modification.   HSBC understands that the CFPB has accepted HSBC Mortgage Services' explanation for why Mr. Moore has not obtained a loan modification and thus considers Mr. Moore's complaint closed. (*See also* Dkt. 42 at 2 (referring to "CFPB's response that they had 'reached out' to HSBC and were satisfied with HSBC's answer").) Mr. Moore is not the subject of foreclosure proceedings at this time and has not been since 2009.

In his letters to this Court, Mr. Moore requests access to the Monitor's Report in order to provide "all of the relevant information" to the CFPB for purposes of evaluating his complaint. (Dkt. 42 at 2.) He contends that the Monitor's Report would "validate [his] claims that HSBC is in direct violation of multiple sections of" consent decrees (i) between HSBC North America Holdings and the Federal Reserve; and (ii) between HSBC Bank USA, N.A. and the Office of the Comptroller of the Currency. (*Id.* at 1; *see also* Dkt. 43 at 2-3.) Both consent decrees pertain to HSBC's residential mortgage servicing practices, including loss mitigation and foreclosure-related activities. Mr. Moore asserts that he believes the Monitor's Report will corroborate his view that HSBC has not fulfilled its obligations under those consent decrees. (Dkt. 43 at 3.) He does not explain the basis for his belief.

**II.      Substantial Interests Support Maintaining the Monitor's Report Under Seal.**

As explained at length in the parties' June 1 submissions, maintaining the Monitor's Report under seal in its entirety is necessary to further vital interests in facilitating a successful monitorship in this and future cases and preventing misuse of the highly confidential information contained in the Report for unlawful purposes.

*A.  Public disclosure of the Monitor's Report would jeopardize the monitorship.*

The scope of the monitorship includes HSBC's more than 60 global affiliates, which reside in countries that have varying bank-secrecy and data-privacy laws and regulatory requirements.  As HSBC previously explained, providing the necessary level of access for the Monitor to conduct a comprehensive review of HSBC's anti-money laundering and sanctions controls has required HSBC to put in place a robust information-sharing framework, under which the Monitor is described as a service provider to the Bank. (Dkt. 38 at 3-4.) HSBC has had to reassure certain regulators that, consistent with the terms of the DPA, any confidential information provided to the

---

[1]        HSBC Mortgage Services, Inc. is not a subsidiary of HSBC Bank USA, N.A., although it is an indirect subsidiary of HSBC Holdings plc.

Case 1:12-cr-00763-AMD   Document 86   Filed 04/10/17   Page 14 of 25 PageID #: 3823
Case 1:12-cr-00763-JG   Document 46   Filed 12/11/15   Page 4 of 8 PageID #: 1366

The Honorable John Gleeson                                                        -4-

Monitor would be adequately protected from disclosure to third parties. (Dkt. 35 at 8-9 (DOJ); Dkt. 35-1 ¶¶ 8-10 (Monitor); Dkt. 38 at 3-4 (HSBC).) In a number of cases, regulators have requested to speak with the Monitor himself about the work he intends to perform and—most relevant here—whether the information to which he seeks access will remain confidential.

        The DPA explicitly provides that the Monitor's "reports and the contents thereof are intended to remain and shall remain non-public." (Dkt. 3-4 ¶ 9.) In reliance on that agreement, both HSBC and the Monitor have given their express assurances to HSBC's non-U.S. regulators that the Monitor's work will remain strictly confidential. The Monitor noted that in his many interactions with HSBC's various regulators around the world, "the presumption of confidentiality has been a critical component in obtaining foreign regulators' agreement to access confidential client information and to rely on it in preparing my reports." (Dkt. 35-1 ¶ 9.) The Monitor provides examples of interactions with regulators in which "my in-person assurance to those regulators that their countrymen's information would be reviewed in confidence—and the results shared only with the FCA, DOJ, and FRB—was crucial to being allowed to see unredacted client files." (*Id.*) HSBC's regulators have amplified the importance of confidentiality to the Monitor's continued access to non-U.S. materials. For example, Bank Negara Malaysia explained that it was "assured that the information obtained and findings made by the Independent Compliance Monitor would be treated with utmost confidentiality, consistent with the confidentiality provisions in our legislation, *i.e.* the Financial Services Act 2013, the Islamic Financial Services Act 2013, the Central Bank of Malaysia Act 2009 and the Anti-Money Laundering, Anti-Terrorism Financing and Proceeds of Unlawful Activities Act 2001." (Dkt. 35-5 ¶ 2.) All of the Monitor's work to date has proceeded under this assurance of confidentiality, and the Monitor is currently in the process of preparing his next annual report based on that same expectation.

        To now publicly release the Monitor's Report would directly contravene those assurances. Such a result might cause those non-U.S. regulators to feel misled, or to conclude that they cannot rely upon assurances of confidentiality regarding the work of corporate compliance monitors appointed in connection with U.S. legal proceedings—either of which would have substantial negative ramifications for the success of this monitorship and future ones. Indeed, if the Report were to become public, certain regulators might decide to withdraw altogether their consent to the Monitor's site visits. Other regulators likely would feel compelled to significantly restrict the confidential information to which the Monitor is given access. The inability of the Monitor to access this information and provide his findings to the Government in a timely manner would compromise the efficacy of the monitorship.

        Publicly releasing the Monitor's Report might also compromise the effectiveness of the Monitor's work itself. As explained in several of the June 1 submissions, open and candid cooperation on the part of HSBC employees is a critical component of the Monitor's investigative work and of HSBC's ability to improve its systems and controls. (Dkt. 35 at 9-10 (DOJ); Dkt 35-1 ¶ 11 (Monitor); Dkt. 35-3 ¶ 20(c) (FCA); Dkt. 35-4 at 2 (HKMA); Dkt. 38 at 4-5 (HSBC).) For example, the FCA cautioned that "the absence of confidentiality may affect the level of cooperation

The Honorable John Gleeson                                                      -5-

currently offered by HSBC employees and [there is a risk] that they may be less willing to be open, honest and candid, which would also be detrimental to FCA's ability to adequately supervise the [HSBC] Group." (Dkt. 35-3 ¶ 20(c).)  Lower-level employees may not be willing to be candid with the Monitor if they know they might be publicly associated with or identified by the information they provide, and senior employees may be less willing to assist in the process if they fear they will be publicly portrayed in an unfavorable light in a future report.

Filing a redacted version of the Report is not an adequate or practical means of satisfying these concerns.  (Dkt. 35 at 12-13 (DOJ); Dkt. 35-1 ¶ 13 (Monitor); Dkt. 35-3 ¶ 24 (FCA); Dkt. 38 at 5 (HSBC).)  Doing so would provide no assurance to regulators concerned about confidentiality—they would lack control over which parts of the Report would be redacted, and thus might still decide that restricting access altogether is the only sure way of protecting confidential information.  Similarly, HSBC employees concerned about being publicly identified by or associated with the Report might choose to be less than fully candid rather than depend on a redaction process into which they will have no input.  And even if all of the confidential information in the 1,000-page report theoretically *could* be redacted to satisfy all of these concerns, the resulting public version of the Report would be virtually unintelligible and more likely to mislead the public than to inform it.  *See United States* v. *Amodeo*, 71 F.3d 1044, 1052 (2d Cir. 1995) (maintaining entire document under seal is appropriate when redacted version would be unintelligible and misleading); (Dkt. 35 at 12-13 (DOJ); Dkt. 35-1 ¶ 13 (Monitor); Dkt. 35-3 ¶ 24 (FCA).)

In short, HSBC is fully committed to facilitating a successful monitorship, but that goal cannot be achieved if the threat of public disclosure of the Monitor's work product looms over the entire process.

B.   *Public disclosure of the Monitor's Report could facilitate unlawful financial activity.*

The Monitor's Report contains detailed descriptions of HSBC's systems and processes designed to detect and prevent money laundering, terrorist financing, and other financial crimes.  Among other things, the Report identifies vulnerabilities, gaps, and areas requiring immediate remediation.  As the Government and the Monitor explained in their June 1 submissions, if the Monitor's Report were to be made public, individuals and entities seeking to exploit those or similar weaknesses at HSBC—or potentially at other financial institutions—would have a detailed roadmap for doing so. (Dkt. 35 at 11 (DOJ); Dkt. 35-1 ¶ 12 (Monitor).)  HSBC's financial regulators expressed similar concerns.  The FCA, for example, cautioned that "publishing this information may enable money launderers and those attempting to evade sanctions controls to target and further exploit HSBC in order to facilitate increased levels of illegal activity."  (Dkt. 35-3 ¶¶ 21-23; *see also* Dkt. 35-2 at 3 (FRB); Dkt. 35-4 at 2 (HKMA); Dkt. 38 at 5 (HSBC).)  Indeed, even publicizing details about the controls that the Monitor deemed to be satisfactory could provide valuable information to those seeking to avoid detection of unlawful activity.  Where public disclosure would aid criminals in circumventing the

The Honorable John Gleeson                                                                                  -6-

very controls that the monitorship is intended to improve, maintaining the Report under seal serves a compelling interest.

**III.   Mr. Moore's Letters Provide No Basis to Unseal the Monitor's Report in View of the Vital Interests in Keeping It Confidential.**

Mr. Moore argues that he should be provided access to the Monitor's Report because he believes it will support his CFPB complaint that HSBC has improperly denied him a loan modification.  But even if the Report were relevant to Mr. Moore's complaint—which it is not—Mr. Moore's individual need for access is not the relevant inquiry in determining whether to unseal the Report.  The question is whether the document should be disclosed to the *general public*.  Both the common law and First Amendment rights of access are intended to safeguard the "*public* perception of the judiciary's legitimacy and independence," *United States* v. *Aref*, 533 F.3d 72, 83 (2d Cir. 2008) (emphasis added), not any individual's private interest in making use of the document.  Accordingly, if the common law or First Amendment right of access does not require the disclosure of a document to the general public, then the requesting individual's motive for seeking access to the document is irrelevant.  *See, e.g., Amodeo*, 71 F.3d at 1050 ("[T]he presumption of access is based on the need for the public monitoring of federal courts . . . [and] we believe motive generally to be irrelevant to defining the weight accorded to the presumption of access."); *United States* v. *Belfort*, 2014 WL 2612508, at *4 (E.D.N.Y. June 11, 2014) (assuming that an individual's request for access was "made in good faith and for a proper purpose" but nonetheless denying access due to the "potential harm that could come from releasing the document *to the public*") (emphasis added).  This Court invited other members of the public to join in Mr. Moore's application to unseal the Monitor's Report.  No party has done so.  Mr. Moore's individual reasons for seeking the release of the Report are insufficient, on their own, to warrant public disclosure.

In any event, Mr. Moore has not demonstrated any likelihood that the Report would be relevant to his CFPB complaint.  Mr. Moore's complaint stems from his inability to obtain a modification of his mortgage, and as such, he references unrelated consent decrees relating to HSBC's residential mortgage servicing business.  But the Monitor's Report does not arise out of those consent decrees or any other consent decree related to mortgage servicing; it was produced in connection with the monitorship pursuant to the DPA.  Mr. Moore has failed to explain how the Monitor's Report, intended to address the status of HSBC's anti-money laundering and sanctions compliance program, would also contain information about HSBC's residential mortgage servicing business that would be relevant to Mr. Moore's CFPB complaint.

Mr. Moore also notes that a news article published in July 2015 states that a reporter had access to the Monitor's Report.  (Dkt. 42 at 1); *see* Greg Farrell, "Sealed HSBC Report Shows U.S. Managers Battling Cleanup Squad," *Bloomberg Business*, July 7, 2015.  Even if it were relevant to the sealing question, the *Bloomberg* article would not justify unsealing the Report in its entirety.  The article discussed only certain, limited findings of the 1,000-page Report; specifically, the actions of certain U.S. HSBC personnel.  By contrast, the Monitor's Report discusses a great many other aspects of his

Case 1:12-cr-00763-AMD   Document 86   Filed 04/10/17   Page 17 of 25 PageID #: 3826
Case 1:12-cr-00763-JG   Document 46   Filed 12/11/15   Page 7 of 8 PageID #: 1369

The Honorable John Gleeson                                                        -7-

findings regarding HSBC affiliates across the globe. *See In re Application of the U.S. for an Order Pursuant to 18 U.S.C. § 2703(d)*, 830 F. Supp. 2d 114, 151 (E.D. Va. 2011) (noting the "significant difference between revealing the existence of an investigation, and exposing critical aspects of its nature and scope," and rejecting the argument that press coverage of investigative documents means that they should be unsealed).

HSBC was dismayed at the prospect that confidential information from the Monitor's Report had been published in a news article. From the beginning, HSBC has implemented strict controls over access to, and dissemination of, the Monitor's Report and related material, and it immediately launched an internal review to determine whether any of its personnel had disclosed any confidential information from the Report that could have been a source of the *Bloomberg* article. HSBC has found no evidence that the reporter obtained the Monitor's Report from HSBC (or, for that matter, that the reporter actually reviewed the Report). Even so, HSBC has continued to take steps to ensure that appropriate controls are in place at the Bank to protect the confidentiality of the Monitor's reports.

The publication of the information in the *Bloomberg* article jeopardized the integrity of the monitorship. It would be inequitable and create perverse incentives to use the fact that members of the press purportedly gained unauthorized access to portions of the Report, notwithstanding the parties' intent that it remain confidential, as a reason to publicly expose the highly confidential contents of the entire Report. *See id.* (acknowledging the "perverse incentives" that would be created if "a party could leak a controversial sealed document to the press, then point to the ensuing publicity as evidence that further sealing is unnecessary"). The Court should not use a potential unauthorized disclosure of a confidential document as a basis to further expose that document to the general public.

## IV.   Conclusion

HSBC is committed to improving, on a global basis, its internal controls designed to detect and prevent money laundering, terrorist financing, and other criminal activities. The monitorship is an important part of that effort. As a result, HSBC has gone to great lengths to facilitate the Monitor's access to HSBC's confidential information across its global affiliates. Making the Monitor's Report publicly available would risk slowing, and even undoing, the very improvements that HSBC is working to implement.

The Honorable John Gleeson                                                    -8-


        Mr. Moore has identified no public interest in access sufficient to outweigh those significant consequences, and there is none. In light of these concerns and those discussed at length in the June 1 submissions, HSBC respectfully requests that the Court maintain the Monitor's Report under seal in its entirety.


        Sincerely,


             /s/
        Samuel W. Seymour
        Alexander J. Willscher
        SULLIVAN & CROMWELL LLP
        125 Broad Street
        New York, NY 10004-2498
        Tel.: (212) 558-4000
        Fax: (212) 558-3588

        *Counsel for HSBC*


cc:     All Counsel of Record (via ECF)

*Ex S*

*Filed and Attested by*
*PROTHONOTARY*
*20 Mar 2017 02:56 PM*
*K. Hume*

Barnes & Thornburg, LLP                              **Attorney for Plaintiff**
By: Robert C. Folland, Esquire
ID. No. 320318
41 S. High St. Suite 3300
Columbus, OH 43215
Telephone: 614-628-0096
Fax: 614-628-1433
Email: Rob.Folland@btlaw.com

---

| | |
|---|---|
| **LSF9 MASTER PARTICIPATION TRUST C/O CALIBER HOME LOANS, INC** | |
| **Plaintiff** | **IN THE COURT OF COMMON PLEAS** |
| **v.** | **CHESTER COUNTY, PENNSYLVANIA** |
| **HUBERT DEAN MOORE, JR.** | |
| **AND** | **CIVIL ACTION NO. 2016-11197-RC** |
| **ANN MARIE FLETCHER-MOORE** | |
| **Defendants** | |

## PRELIMINARY OBJECTIONS TO DEFENDANTS' NEW MATTER & COUNTERCLAIMS

Pursuant to Pennsylvania Rule of Civil Procedure ("Rule") 1028, Plaintiff, LSF8 Master

Participation Trust c/o Caliber Home Loans, Inc., by and through undersigned counsel,

hereby submits preliminarily objections to Defendants' Hubert Dean Moore and Ann Marie

Fletcher-Moore ("Defendants") Counterclaims.

## Relevant Background

1.  On November 29, 2016, Plaintiff commenced this in rem foreclosure action by filing a Complaint in Mortgage Foreclosure, which seeks only to foreclose the mortgage and sell the property pursuant to Pennsylvania law.

2.  On March 27, 2006, Defendants made, executed, and delivered a mortgage upon the property located at 618 Meadow Drive, West Chester, PA 19380-6235 to Accredited Home Lenders, Inc.

3.  On December 8, 2015, the mortgage was assigned to Plaintiff and recorded in the Office of the Recorder of Deeds of Chester County, in Mortgage Book 9348, Page 540.

4.  Defendants defaulted on the mortgage by failing to make monthly payments of principal and interest due for August 1, 2015 and each month thereafter, despite written notice that such payments were due.

5.  On February 7, 2017 Defendants filed their Answer with New Matter and Counterclaims ("New Matter" will refer to paragraphs on pages 1-7 of Defendants' Answer with New Matter and Counterclaim and "Counterclaims" will refer to paragraphs on pages 8-14 of Defendants' Answer with New Matter and Counterclaim). In their Counterclaims, Defendants assert the following counterclaims:

    i.   Breach of Mortgage Agreement

    ii.  Breach of Contract

    iii. Breach of Duty of Good Faith and Fair Dealing

    iv.  Promissory Estoppel

2

# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

*Ex 6*

---

# SCHEDULE TO

### (Rule 14d-100)
### Tender Offer Statement under Section 14(d)(1)
### or Section 13(e)(1) of the Securities Exchange Act of 1934
### (Amendment No. 2)

---

# ACCREDITED HOME LENDERS HOLDING CO.

**(Name of Subject Company (Issuer))**

# LSF5 ACCREDITED MERGER CO., INC.

a wholly-owned subsidiary of

# LSF5 ACCREDITED INVESTMENTS, LLC

**(Names of Filing Persons (Offerors))**

**Common Stock, par value $0.001 per share**
**(Title of Class of Securities)**

**00437P107**
**(CUSIP Number of Class of Securities)**

**Marc L. Lipshy**
**LSF5 Accredited Merger Co., Inc.**
**717 North Harwood Street, Suite 2200**
**Dallas, TX 75201**
**(214) 754-8430**

**(Name, address and telephone number of person authorized to receive notices and communications on behalf of filing persons)**

*With a copy to:*

**Mitchell S. Eitel, Esq.**
**John J. O'Brien, Esq.**
**Sullivan & Cromwell LLP**
**125 Broad Street**
**New York, New York 10004**
**Telephone: (212) 558-4000**

**CALCULATION OF FILING FEE**

| Transaction Valuation* | Amount of Filing Fee** |
|---|---|
| $379,344,495.20 | $11,645.88 |

\*   Estimated for purposes of calculating the amount of the filing fee only. This calculation assumes the purchase of (i) the 25,122,152 outstanding shares of common stock, par value $0.001 per share (the "Shares"), of Accredited Home Lenders Holding Co. (the "Company") at a price of $15.10 per Share. The calculation of the filing fee is based on the Company's representation of its capitalization as of May 31, 2007.



PA Dept of Banking and Securities
RECEIVED
NOV – 9 2016
Consumer Services Division

November 7, 2016

Crystal Dietrich
Department of Banking and Securities
Consumer Services Office
17 North Second Street
Suite 1300
Harrisburg, PA 17101

Sent via UPS: 1Z08506X1396324264

Re:    Caliber Loan Number:  9804489954
      Borrower(s):  Hubert Dean Moore and Ann Marie Fletcher-Moore
      Property Address:  618 Meadow Drive West Chester, PA 19380-6235

Dear Ms. Dietrich:

Caliber Home Loans, Inc., hereafter known as Caliber, servicer of the above-referenced loan, provides this response to an inquiry received October 19, 2016, wherein you express the following concerns on behalf of Mr. Moore:

    i.     Mr. Moore is seeking documentation concerning the sale and purchase of his mortgage.
    ii.    He claims that Caliber did not register the mortgage with Chester County within 60 days.
    iii.   Mr. Moore questions whether Caliber owns the loan and has authority to perform the actions that it has.

Additionally, you state that Mr. Moore has provided documentation which he indicates is evidence which shows he has paid the school taxes that should not have been paid by the previous servicer HSBC. Therefore, you request Caliber to review and provide an explanation relating to the documentation as well as allegations expressed to the Pennsylvania Department of Banking and Securities by Mr. Moore.

**Loan Background and Status**

Our records reflect the following key events related to the loan:

- The loan originated on March 27, 2006 with a principal balance of $490,000.00 with Accredited Home Lenders, Inc. A California Corporation.
- The previous servicer of the loan was HSBC Mortgage Services, Inc.
- Caliber began servicing the loan on December 8, 2015.
- The loan is contractually due for the August 1, 2015 and subsequent monthly installments.
- The last payment was received on September 29, 2015.
- Due to the contractual delinquency of the loan, the property was referred to foreclosure on July 6, 2016.



Crystal Dietrich
Re: Hubert Dean Moore and Ann Marie Fletcher-Moore
11/7/16
Page 2 of 4

- A foreclosure sale date is not currently scheduled.

**Prior Servicer**

Caliber has reviewed Mr. Moore's allegations regarding HSBC Mortgage Services, Inc.; however, we are unable to comment regarding the events which transpired on the loan, prior to Caliber acquiring the servicing rights as we are not affiliated with the previous servicer other that successor servicer. Please note Caliber adheres to all federal and state laws regarding the servicing of mortgage loans, and do not believe Caliber has violated servicing guidelines. Caliber also did not originate this loan. Therefore, if Mr. Moore has any concerns regarding this loan's origination, or prior servicing we respectfully request that Mr. Moore direct these matters to the appropriate entities in question.

**Validation of Debt**

Caliber would like to emphasize, this inquiry is substantially similar to previous inquiries received from Mr. Moore. Our records indicate Caliber has responded similar concerns as follows:

- Dated February 11, 2016 sent via USPS tracking number 70142120000431709953 and delivered on February 18, 2016 at 3:02 p.m.
- Dated April 29, 2016 from the Consumer Financial Protection Bureau, referencing CFPB Case Number(s) 160414-002197, 160414-000924, 160414-000925, 160414-000073, 160414-000017, 160414-000071, 160414-000018, 160414-000272, 160413-001025, 160413-002220, 160413-002224.
- Dated July 28, 2016 from Pennsylvania Department of Banking and Securities sent via email chrhodge@pa.gov and via UPS tracking number 1Z08506X1398266707. This response was delivered on August 1, 2016 at 9:22 a.m.

Copies of each of the letters noted above were recently provided in our correspondence dated July 28, 2016. After review of the correspondences noted above, Caliber has determined, Mr. Moore's request to receive all documentation and records including internal and external emails concerning the "sale" and "purchase" of the mortgage loan, we believe does not appear to relate to a purported error on the loan. Caliber respectfully declines Mr. Moore's request. Please be advised, per federal and state laws Caliber validated Mr. Moore's debt obligation within thirty (30) days of receipt of his letters, by including a copy of his executed Balloon Note and Mortgage. Caliber found no legitimacy in Mr. Moore's claims relating to Caliber herein regarding unethical practices.

**Assignment of Mortgage**

As a measure of good faith, Caliber has enclosed a copy of the recorded assignment chain, as well as, the full record of Mortgage Electronic Registration Systems, Inc. (MERS) milestones report. Caliber



Crystal Dietrich
Re: Hubert Dean Moore and Ann Marie Fletcher-Moore
11/7/16
Page **3** of **4**

has also validated that the loan was originated through MERS as nominee for Accredited Home Lenders. It is important to point out, although the transfer of ownership to HSBC was not recorded via paper assignment through the county loan, the transfer of ownership was done systematically through MERS.

Additionally, a paper assignment is only required to be recorded with the county at the time the loan goes into default or a bankruptcy is filed in which at that time, the loan is then deactivated from the MERS registration and all transfers are to then be recorded with the county. Caliber also has confirmed, there is no state required time frame for an assignment to be recorded with the county, and could not locate an introductory letter, as Mr. Moore alleges he received from Caliber in the month of December 2015 which validates the assignment of mortgage would be registered within (fourteen) 14 days.

In conclusion, Caliber believes the requested clarification Mr. Moore seeks regarding the servicing transfer of the loan, and applicable documentation has been provided and explained to him. Again, multiple inquiries continue to submit by Mr. Moore, in which all have been responded to by Caliber. We take every inquiry with the upmost seriousness, and strive to provide exemplary service for every borrower inquiry.

Caliber believes to have already performed our duty of investigation and must emphasize, that without Mr. Moore providing additional information in order to address a different or new concern or without providing Caliber with supporting documentation to validate his contentions, our responses to these identical concerns will remain consistent as we believe our prior responses to be complete and accurate.

**<u>Lender Paid Taxes</u>**

Caliber has reviewed the documentation provided within Mr. Moore's inquiry. Caliber would like to point out, the documentation provided is not proof of payment from Mr. Moore. The documentation provided is a paid receipt from that of the previous servicer, HSBC Mortgage Services, Inc. Again, prior to the loan transferring to Caliber, HSBC Mortgage Services, Inc. ensured that there were no delinquent taxes due on this loan when it was transferred to Caliber. As a reminder, Mr. Moore's taxes are payable in the month of March each year for his town taxes and in the month of August for his school taxes in order to take advantage of the early pay discount.

Mr. Moore's loan was not escrowed; therefore, it was his responsibility to ensure that the property taxes were paid in a timely manner. As noted in our prior responses, on October 29, 2015, HSBC paid the delinquent 2015 School and Town Taxes in the amount of $4,228.08, as well as a bill fee of $5.00.


**CALIBER**
HOME LOANS

Crystal Dietrich
Re: Hubert Dean Moore and Ann Marie Fletcher-Moore
11/7/16
Page 4 of 4

Caliber has already verified, that the 2015 Town and School taxes were delinquent when HSBC Mortgage Services, Inc. issued payment. The tax disbursements were billed directly to the borrower's account as an ancillary fee for Lender Paid Taxes. The loan was transferred to Caliber effective December 8, 2015. The proof of payment, provided in Mr. Moore's inquiry provides a paid stamp indicating that the funds were posted to the account on November 23, 2015 and also indicates that the tax payment deadline was October 31, 2015 before penalties were assessed.

Again, Caliber has confirmed this proof of payment coincides with HSBC records for the Town and School tax disbursements. Furthermore, the tax collector has indicated that no duplicate payments have been received. Caliber stands by the information previous provided which indicated unless proof of payment is given from Mr. Moore evidencing that the taxes from 2015 were not delinquent, and he has paid them, the total lender paid tax advance balance of $4,233.08 will remain on the loan until paid in full.

**Loan Status**

Our records indicate the loan is contractually due for the August 1, 2015 and subsequent monthly installments. Due to the contractual delinquency of the loan, the property was referred to foreclosure on July 6, 2016.  A foreclosure sale date is not currently scheduled. We encourage Mr. Moore to contact our Single Point of Contact Department, at 1-800-401-6587, with any additional questions or concerns he may have regarding his loan.

Caliber values the opportunity to address your concerns and we trust the information provided affords a satisfactory resolution to the matter. Should you have further questions regarding this response, please send an email to complaintresolution@caliberhomeloans.com. Please utilize our shared email box to ensure your email is received and responded to in a timely manner.

Sincerely,

*Courtney Ruiz*

Courtney Ruiz
Vice President
Customer Support and Escalations

Enclosures